SO ORDERED,

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: October 21, 2019

**The Order of the Court is set forth below. The docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**WORLD HEALTH JETS LLC,**                    **CASE NO. 16-00296-NPO**

**DEBTOR.**                                   **CHAPTER 7**

**ORIGIN BANK**                               **PLAINTIFF**

**VS.**                                       **ADV. PROC. 19-00026-NPO**

**MITCHELL CHAD BARRETT**                     **DEFENDANT**

## MEMORANDUM OPINION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter came before the Court on the Order issued by Judge Carlton W. Reeves of the U.S. District Court for the Southern District of Mississippi, Northern Division (the "District Court") in *Origin Bank, formerly known as Community Trust Bank v. Mitchell Chad Barrett*, No. 3:17-cv-00920-CWR-LRA (S.D. Miss. June 11, 2019) (the "Referral Order") (Adv. Dkt. 1),[1]

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-styled adversary proceeding (the "Adversary") are cited as "(Adv. Dkt. ____)"; and (2) citations to docket entries in the above-styled bankruptcy case (the "WHJ Case") are cited as "(Bankr. Dkt. ____)". Page numbers are to the numbers at the top of the page automatically generated by the Court's CM/ECF system and not to the document's native pagination.

referring the Adversary to this Court for final adjudication pursuant to 28 U.S.C. § 157(a). Presently before the Court are cross-motions for summary judgment as well as related responses, briefs, and a motion, all filed originally in the District Court, referred by Judge Reeves to this Court, and docketed in the Adversary as follows:  (1) the Motion for Summary Judgment (the "Barrett Summary Judgment Motion") (Adv. Dkt. 65) filed by Mitchell Chad Barrett ("Barrett"); the Memorandum in Support of Motion for Summary Judgment (the "Barrett Summary Judgment Brief") (Adv. Dkt. 66) filed by Barrett; Origin Bank's Response to Defendant's Motion for Summary Judgment (the "Origin Response to Barrett Summary Judgment Motion") (Adv. Dkt. 82) filed by Origin Bank; the Memorandum Brief in Support of Origin Bank's Response to Defendant's Motion for Summary Judgment (the "Origin Brief in Support of Response to Barrett Summary Judgment Motion") (Adv. Dkt. 83) filed by Origin Bank; Mitchell Chad Barrett's Rebuttal to Origin's Response to Motion for Summary Judgment (the "Barrett Rebuttal") (Adv. Dkt. 84) filed by Barrett; the Memorandum in Support of Mitchell Chad Barrett's Rebuttal to Origin's Response to Motion for Summary Judgment (the "Barrett Rebuttal Brief") (Adv. Dkt. 85) filed by Barrett; (2) Origin Bank's Motion for Summary Judgment (the "Origin Summary Judgment Motion" or, together with the Barrett Summary Judgment Motion, the "Cross-Motions for Summary Judgment") (Adv. Dkt. 69) filed by Origin Bank; the Memorandum Brief in Support of Origin Bank's Motion for Summary Judgment (the "Origin Summary Judgment Brief") (Adv. Dkt. 70) filed by Origin Bank; Mitchell Chad Barrett's Response to Origin Bank's Motion for Summary Judgment (the "Barrett Response to Origin Summary Judgment Motion") (Adv. Dkt. 80) filed by Barrett; Mitchell Chad Barrett's Memorandum in Support of Response to Origin Bank's Motion for Summary Judgment (the "Barrett Brief in Support of Response to Origin Summary Judgment Motion") (Adv. Dkt. 81) filed by Barrett; the Rebuttal Memorandum in

Support of Origin Bank's Motion for Summary Judgment (the "Origin Rebuttal Brief") (Adv. Dkt. 86) filed by Origin Bank; (3) the Motion to Strike Affidavit of Randy Impson Attached to Origin Bank's Motion for Summary Judgment (the "Motion to Strike") (Adv. Dkt. 78) filed by Barrett; the Memorandum in Support of Motion to Strike Affidavit of Randy Impson Attached to Origin Bank's Motion for Summary Judgment (the "Brief in Support of Motion to Strike") (Adv. Dkt. 79) filed by Barrett; Origin Bank's Response and Objection to Defendant's Motion to Strike the Affidavit of Randy Impson Attached to Origin Bank's Motion for Summary Judgment (the "Origin Response to Motion to Strike") (Adv. Dkt. 90) filed by Origin Bank; and the Memorandum Brief in Support of Origin Bank's Response and Objection to Defendant's Motion to Strike the Affidavit of Randy Impson Attached to Origin Bank's Motion for Summary Judgment (the "Origin Brief in Support of Response to Motion to Strike") (Adv. Dkt. 91) filed by Origin Bank.

Barrett attached four (4) exhibits, marked as Exhibits "A" through "D" (Adv. Dkt. 65-1 to 65-4), to the Barrett Summary Judgment Motion and five (5) exhibits, marked as Exhibits "A" through "E" (Adv. Dkt. 80-1 to 80-5), to the Barrett Response to Origin Summary Judgment Motion. Origin Bank attached three (3) exhibits, marked as Exhibits "1" through "3" (Adv. Dkt. 69-1 to 69-11), to the Origin Summary Judgment Motion and five (5) exhibits, marked as Exhibits "1" through "5" (Adv. Dkt. 82-1 to 82-12), to the Origin Response to Barrett Summary Judgment Motion. Barrett attached four (4) exhibits, marked as Exhibits "A" through "D" (Adv. Dkt. 78-1 to 78-4), to the Motion to Strike, and Origin Bank attached one (1) exhibit, marked as Exhibit "1" (Adv. Dkt. 90-1 to 90-8), to the Origin Response to Motion to Strike. Many of the exhibits are redundant. For clarity and ease of reference, citations to exhibits are to the docket number where that exhibit first appears in the record.

**Jurisdiction**

The Court has jurisdiction over the subject matter of and the party to this proceeding pursuant to 28 U.S.C. § 1334.  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  The parties have agreed that this Court has the statutory power and constitutional authority to adjudicate and finally dispose of all claims in the Adversary.  (Adv. Dkt. 94, 99). Notice of the Cross-Motions for Summary Judgment, the Motion to Strike, and the related responses and briefs was proper under the circumstances.

At a status conference held on August 6, 2019, the Court expressed its concern that the docket in the Adversary may not include all documents filed in the District Court related to the Cross-Motions for Summary Judgment and the Motion to Strike.  (Adv. Dkt. 102).  The Court, therefore, ordered the parties from the bench to file a stipulation either confirming that the docket was complete or specifying those documents that were missing from the docket.  On August 9, 2019, the parties filed the Joint Stipulation Regarding Record Transfer (Adv. Dkt. 107) confirming that the docket in the Adversary is accurate and complete.

**Facts[2]**

1.     Barrett is a pharmacist who in 2013 formed World Health Jets, LLC ("WHJ") under the laws of Mississippi.  (Adv. Dkt. 69-10 at 5).  WHJ was one of several companies operating under the umbrella of World Health Industries, Inc. ("WHI"), a management consultant pharmaceutical company purchased by Barrett in 2008.  (Adv. Dkt. 69-10 at 6).  All WHI-affiliated

---

[2] Pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable to the Adversary by Rule 7052 of the Federal Rules of Bankruptcy Procedure, the following constitutes the findings of fact and conclusions of law of the Court.

companies were retail pharmacies with the exception of WHJ, which was formed as an asset-holding company.

2.      On November 27, 2013, WHJ obtained a commercial loan from Origin Bank, formerly known as Community Trust Bank,[3] in the original principal amount of $3,150,000.00 (the "WHJ Loan") to finance the purchase of a jet aircraft, or more specifically a 2013 Embraer Phenom 100 EMB 500 (the "Airplane").  Five days before Origin Bank extended the WHJ Loan, Origin Bank sent Barrett a letter dated November 22, 2013 proposing the terms of the WHJ Loan "subject to customary due diligence" (the "Terms Letter") (Adv. Dkt. 82-12).  The Terms Letter identified Barrett, James L. Bennett ("Bennett"), David Jason Rutland ("Rutland"), and WHI as guarantors of the WHJ Loan.  (Adv. Dkt. 69-10 at 14; Adv. Dkt. 82-12 at 1).  In connection with the WHJ Loan and thereafter Barrett provided personal financial statements to Origin Bank for the years of 2013, 2014, and 2015.  (Adv. Dkt. 69-1, ¶ 11).

3.      The WHJ Loan is evidenced by a Promissory Note (the "WHJ Note") (Adv. Dkt. 69-2 at 1-2), a Business Loan Agreement (the "WHJ Loan Agreement") (Adv. Dkt. 69-2 at 3-8), and a Notice of Final Agreement (the "Notice of Final Agreement") (Adv. Dkt. 69-2 at 9-10) (collectively, the "WHJ Loan Documents").  The WHJ Loan Agreement and the Notice of Final Agreement listed the same guarantors that were identified in the Terms Letter:  Barrett, WHI, Rutland, and Bennett (Adv. Dkt. 69-2 at 5, 9).  The WHJ Loan Documents are signed on behalf of WHJ by Rutland, its then managing member.  (Adv. Dkt. 69-10 at 10).  The Notice of Final Agreement also is signed by Barrett, Bennett, and WHI.  (Adv. Dkt. 69-2 at 10).

---

[3] For ease of reference, the Court will refer only to Origin Bank although Origin Bank was known as Community Trust Bank at the time of the loan transaction in question and many of the documents submitted as exhibits refer to Community Trust Bank.

4.      Pursuant to the terms of the WHJ Loan Documents, WHJ agreed to repay the WHJ Loan in monthly installments of $23,793.70 beginning December 27, 2013 (the "WHJ Debt") (Adv. Dkt. 69-2 at 1).  The last payment became due on November 27, 2018.

5.      As security for the repayment of the WHJ Debt:

a.      WHJ granted to Origin Bank a continuing security interest in the Airplane and all proceeds from any sale of the Airplane, as set forth in the Department of Transportation Federal Aviation Administration Aircraft Security Agreement (the "Aircraft Security Agreement") (Adv. Dkt. 69-3), entered into between WHJ and Origin Bank and signed by Rutland on behalf of WHJ;

b.      WHJ granted to Origin Bank a continuing security interest in any and all funds that WHJ may have on deposit with Origin Bank or in certificates of deposit or other deposit accounts (Adv. Dkt. 69-2); and

c.      Barrett purportedly executed in favor of Origin Bank a Commercial Guaranty (the "WHJ Guaranty") (Adv. Dkt. 69-2) personally guaranteeing the full repayment of the WHJ Debt.[4]  Barrett denies that the signature on the WHJ Guaranty is his and denies that he authorized anyone to sign his name to the WHJ Guaranty.  (Adv. Dkt. 65-3 at 7-8).

6.      After WHJ provided Origin Bank with the executed WHJ Note, the WHJ Loan Agreement, the Aircraft Security Agreement, and the WHJ Guaranty, Origin Bank funded the WHJ Loan, which WHJ used to purchase the Airplane.

7.      WHJ operated the Airplane from the Jackson-Evers International Airport in Jackson, Mississippi, on behalf of WHI so that Barrett could call on doctors and other prescribers

---

[4] As discussed later in this Opinion, Barrett alleges that the signature on the WHJ Guaranty is a forgery.  He does not challenge the authenticity of his signature on any other documents.

of medical prescriptions from California to the northeastern part of the United States on behalf of WHI's affiliated pharmacies. (Case No. 16-00297-NPO, Dkt. 964 at 6).

8.    On February 19, 2015, Barrett filed a lawsuit against WHI, Rutland, Bennett, and other individuals in the Chancery Court of Hinds County, Mississippi, Civil Action No. G-2015-241. The parties settled that lawsuit and entered into a Master Settlement Agreement (the "MSA") (Adv. Dkt. 82-11) on April 13, 2015, which, acting as a "corporate divorce," divided the retail pharmacies operating under the umbrella of WHI between Barrett and the other members of WHI. As a result, Barrett relinquished his ownership interest in WHI, and the remaining members of WHI, in return, relinquished their ownership interests in WHJ and several retail pharmacies to Barrett. At this point, Barrett became the sole member and manager of WHJ. (Case No. 16-00297-NPO, Dkt. 843 at 3). To facilitate the MSA, Origin Bank agreed to release Rutland and Bennett as guarantors of the WHJ Loan as described in a letter dated March 30, 2015 (the "Guaranty Modification Letter") (Adv. Dkt. 82-12). Barrett then formed several new entities. He formed Opus Management Group Jackson LLC ("Opus Management Group") specifically to provide management and administrative services for his retail pharmacies. (Case No. 16-00297-NPO, Dkt. 964 at 6; Adv. Dkt. 69-10 at 48-50). From this point forward, WHJ operated the Airplane on behalf of Opus Management Group and the pharmacies Barrett retained in the "corporate divorce." (Adv. Dkt. 69-10 at 50).

9.    In June 2015, Opus Management Group obtained from Origin Bank a $1.5 million revolving line of credit and an additional $500,000 revolving line of credit as part of a credit card agreement (the "Opus Debt").[5] To guarantee repayment of the Opus Debt, Farm007 Holdings,

---

[5] This transaction between Origin Bank and Opus Management Group is not directly relevant to the Adversary but a discussion is necessary to provide context to a global settlement agreement involving WHJ, Barrett, Opus Management Group, and Origin Bank.

LLC ("Farm007") granted Origin Bank a security interest in a $2 million certificate of deposit (the "Farm007 CD"). Barrett and his wife had formed Farm007 in 2011 or 2012 with Barrett then owning the majority membership interest. (Adv. Dkt. 69-10 at 40-41).

10.     On January 21, 2016, the U.S. Department of Justice (the "DOJ") seized the assets of Opus Management Group, WHJ, and numerous compounding pharmacies in Mississippi, including many owned by Barrett and managed by Opus Management Group. No reason was given for these seizures except that the DOJ had been conducting a statewide health care fraud investigation. The Airplane was among the assets seized by the Federal Bureau of Investigation and/or the Office of the United States Marshals. (Adv. Dkt. 69-10 at 20-21). They arranged for the Airplane to be flown from the Jackson-Evers International Airport to an airport in Houston, Texas where it remained until counsel for WHJ negotiated its release. (Adv. Dkt. 69-1, ¶ 18).

11.     Because of the adverse publicity following the DOJ's seizures of assets, many companies terminated their business relationships with Opus Management Group and the affiliated retail pharmacies owned by Barrett. (Case No. 16-00297-NPO, Dkt. 964 at 7, Adv. Dkt. 69-10 at 21, 47). On February 2, 2016, WHJ commenced the WHJ Case by filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (Bankr. Dkt. 1). In amended Schedule A/B: Assets—Real and Personal Property (Bankr. Dkt. 109-1), WHJ listed the Airplane, which it valued at $2,850,000.00.

12.     On the same date that WHJ filed its voluntary petition for relief, Opus Management Group and five other pharmacies affiliated with WHJ commenced bankruptcy cases. On March 4, 2016, these cases were administratively consolidated into the lead bankruptcy case of Opus Management Group (the "Lead Bankruptcy Case") (Case No. 16-00297-NPO) pursuant to the Order Granting Motion of World Health Jets LLC for Order Directing Joint Administration of

Affiliated Cases Pursuant to Bankruptcy Rule 1015(b) (the "Consolidation Order") (Bankr. Dkt. 95).[6]

13.     In the WHJ Case, Origin Bank filed a proof of claim in the amount of $2,837,480.35 (the "Origin POC") (Bankr. Cl. 4-1) identifying Barrett as a co-debtor on the WHJ Loan.  Neither WHJ nor Barrett filed an objection to the Origin POC.

14.     On February 25, 2016, Origin Bank filed a motion to terminate the automatic stay under 11 U.S.C. § 362 and abandon the Airplane from WHJ's bankruptcy estate pursuant to 11 U.S.C. § 554(b).  (Bankr. Dkt. 80).  WHJ opposed the motion (Bankr. Dkt. 225), asserting that selling the Airplane through a sales process under 11 U.S.C. § 363 would be beneficial to all parties and that WHJ was uncertain of the Airplane's value and, therefore, was uncertain as to whether any equity existed.  Origin Bank filed a reply to WHJ's response (Case No. 16-00297-NPO, Dkt. 257), reiterating its request for relief from the automatic stay and the abandonment of the Airplane from the WHJ bankruptcy estate.

15.     In March 2016, Farm007 initiated a declaratory judgment action against Origin Bank in District Court in 3:16-cv-00174-DPJ-FKB (the "Farm007 Action").  Farm007 alleged in the Complaint for Declaratory Relief that Opus Management Group owed Origin Bank approximately $368,117.84, that the $2 million Farm007 CD that secured the Opus Debt exceeded that balance, and that Origin Bank had refused to pay the balance of the Opus Debt out of the Farm007 CD on the ground it cross-collateralized the WHJ Loan, which Farm007 disputed.  As a result, Origin Bank refused to release the remaining amount of the Farm007 CD to Farm007.

---

[6] The Consolidation Order required that all contested matters be filed in the Lead Bankruptcy Case, that the bankruptcy schedules be filed in the WHJ Case, and that proofs of claim by creditors of WHJ be filed in the WHJ Case.

16.     On April 4, 2016, the Court entered in the Lead Bankruptcy Case the Agreed Order on Origin Bank's Motion to Lift Automatic Stay and Abandon Collateral and for Other Relief (the "Agreed Stay Order") (Case No. 16-00297-NPO, Dkt. 270), granting Origin Bank relief from the automatic stay of 11 U.S.C. § 362 with respect to the enforcement of its liens and interests in the Airplane to the extent necessary to permit Origin Bank to secure possession of the Airplane and "to foreclose, sell, retain, or otherwise dispose of" the Airplane.  The Agreed Stay Order, signed by counsel for WHJ and counsel for Origin Bank, however, did not abandon the Airplane from the bankruptcy estate.

17.     Given the pending sale of the pharmacies of its affiliated debtors in the Lead Bankruptcy Case, Opus Management Group and WHJ determined that they no longer had any use for the Airplane in their business operations.  Following entry of the Agreed Stay Order, counsel for WHJ coordinated with the DOJ, Origin Bank, and Barrett concerning the terms and conditions under which the Airplane could be sold through the WHJ Case.  To that end, Origin Bank, Barrett, WHJ, Opus Management Group, and Farm007 entered into and executed the Release and Settlement Agreement (the "Settlement Agreement") (Adv. Dkt. 69-6), effective July 12, 2016.  Barrett does not dispute that he signed the Settlement Agreement but claims he did so under the mistaken belief that he actually had signed the WHJ Guaranty.  (Adv. Dkt. 81 at 12-13).

18.     On July 13, 2016, Origin Bank, Barrett, WHJ, Opus Management Group, and Farm007 filed in the Lead Bankruptcy Case the Joint Motion for an Order (1) Approving Settlement and Compromise and (2) Approving Agreed Order Lifting the Automatic Stay and for Other Related Relief (the "Joint Motion for Approval of Settlement") (No. 16-00297-NPO, Dkt. 453), which the Court approved in the Agreed Order Granting Joint Motion for an Order (1) Approving Settlement and Compromise and (2) Approving Agreed Order Lifting the Automatic

Stay and for Other Related Relief (the "Settlement Order") (Case No. 16-00297-NPO, Dkt. 485) entered in the Lead Bankruptcy Case on August 9, 2016. The Settlement Order was signed by John D. Moore as counsel for both Barrett and Farm007.

19.     A recitation in the Settlement Agreement provides that "Barrett executed in favor of Origin [Bank] a *Commercial Guaranty* (the "WHJ Guaranty") absolutely and unconditionally guaranteeing the prompt and full repayment of all indebtedness, and performance and satisfaction of all obligations, owed by WHJ to Origin at any time, including but not necessarily limited to the WHJ Indebtedness and all obligations owed under the terms of the WHJ Note and WHJ Loan Agreement." (Adv. Dkt. 69-6 at 2).

20.     A summary of the conditions and terms of the Settlement Agreement is as follows:

a.     Origin Bank agreed to apply the proceeds of the $2 million Farm007 CD to pay the Opus Debt.

b.     Farm007 agreed to allow Origin Bank to retain $700,000.00 from the remaining proceeds of the Farm007 CD as additional security for the repayment of the WHJ Loan.

c.     Origin Bank agreed to release the remaining Farm007 CD proceeds to Farm007.

d.     Farm007 agreed to dismiss the Farm007 Action.

e.     The parties agreed that the proceeds from the sale of the Airplane would be conveyed to Origin Bank until the WHJ Debt was paid and satisfied in full.

f.     Origin Bank agreed to apply to the WHJ Loan first the proceeds from the sale of the Airplane to the WHJ Loan and second the $700,000.00 retained funds, and to return any remaining retained funds to Farm007.

g.      The parties agreed to consent to a process for the sale of the Airplane to be approved by this Court.

h.      Origin Bank and Barrett agreed to enter into an agreement with an airplane sales broker to obtain the highest resale value for the Airplane with the retention of the broker to be for a term of 180 days as approved by this Court.

i.      Barrett agreed to be responsible for the payment of all costs to hangar, store, maintain, pilot (for test runs), market, and sell the Airplane, including all brokerage sales fees and commissions.

j.      Barrett agreed to provide the necessary financial and other assistance to enable WHJ to maintain the current insurance policy covering the Airplane.

k.      Origin Bank agreed to forbear pursuit of recovery on the WHJ Guaranty from Barrett until completion of the sale of the Airplane or the end of the sales agreement but no longer than 180 days from entry of an order approving the broker.

*l.*      The parties agreed to mutual releases.  Of relevance, Barrett released Origin Bank "from any and all claims . . . whether known or unknown, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, which [he] . . . may now have, or ha[s] ever had, or may hereafter have, against . . . Origin [Bank], arising out of, relating to, resulting from, and/or in any way connected with . . . the WHJ Loan Documents or Indebtedness . . . [or] the Airplane."  (Adv. Dkt. 69-6 at 16-17)

m.      The parties agreed that in entering into the Settlement Agreement, they either relied upon the advice of their own attorney concerning the legal consequences of the Settlement Agreement or had the opportunity to consult with an attorney but voluntarily chose not to do so.  (Adv. Dkt. 69-6 at 24)  They also acknowledged that they either had

the terms of the Settlement Agreement read to them by their attorney or choose not to consult with an attorney and read the terms of the Settlement Agreement themselves. Regardless, the parties warranted that they did not rely upon the representations by any other party or counsel for any other party other than those set forth in the Settlement Agreement.

21.     As of this date, Barrett has not filed in the WHJ Case a motion to vacate and set aside the Settlement Agreement.

22.     Opus Management Group and WHJ filed in the Lead Bankruptcy Case the Debtors' Application to Employ EXOS Aviation, LLC as Broker for Sale of Aircraft (Case No. 16-00297-NPO, Dkt. 460), which the Court granted on August 18, 2016 (the "Order Approving Broker") (Case No. 16-00297-NPO, Dkt. 494) and the Motion for Authority to Sell Airplane Free and Clear of All Liens, Claims, Interests and Encumbrances Outside of the Ordinary Course of Business (Case No. 16-00297-NPO, Dkt. 459), which the Court granted on August 19, 2016 (the "Sales-Procedures Order") (Case No. 16-00297-NPO, Dkt. 497).

23.     Consistent with the Settlement Agreement, Farm007 dismissed the Farm007 Action against Origin Bank in August 2017.  (No. 3:16-cv-00174-DPJ-FKB, Dkt. 7).

24.     Opus Management Group filed a motion in the Lead Bankruptcy Case seeking authority to surcharge Origin Bank for attorney's fees and expenses incurred in connection with preserving and selling the Airplane (the "Surcharge Motion") (Case No. 16-00297-NPO, Dkt. 843). The information disclosed at a hearing on Origin Bank's request for a continuance of the hearing set on the Surcharge Motion raised certain concerns as to the continued viability of WHJ. (Case No. 16-00297-NPO, Dkt. 849).  The Court issued an order to show cause why the WHJ Case should not be converted to a chapter 7 case.  (Bankr. Dkt. 183).  After a hearing, the Court on

August 17, 2017, entered in the WHJ Case the Order Resolving Show Cause Order, Converting Chapter 11 Case to Chapter 7 Case, and Modifying Consolidation Order (the "Conversion Order") (Bankr. Dkt. 197), which converted the WHJ Case to a chapter 7 and modified the Consolidation Order to administer the WHJ Case separately from the other bankruptcy cases.  In the Conversion Order, the Court noted the statements of counsel for WHJ that there was no equity in the Airplane, that the ongoing cost to store the Airplane in a hangar and maintain its engines was approximately $4,000.00 per month, and that WHJ had no money to pay that expense or any other expense.  The Court also noted that the monthly operating reports filed in the WHJ Case indicated that WHJ had had no net cash flow from March 2016 through June 2017.  The Court further noted that WHJ had allowed the insurance coverage on the Airplane to lapse, and Origin Bank had purchased force-placed insurance to protects its interests.

25.     The Airplane did not sell while in the custody and control of EXOS Aviation, LLC. (Adv. Dkt. 69-1, ¶ 32).

26.     On August 22, 2017, the Court entered in the WHJ Case the Agreed Order on Origin Bank's Motion to Compel Abandonment of Collateral [Dkt. #868] (the "Agreed Abandonment Order") (Case No. 16-00297-NPO, Dkt. 924), which abandoned the Airplane and any and all proceeds from any sale or disposition of the Airplane from the WHJ bankruptcy estate, and permitted Origin Bank to liquidate the Airplane.

27.     On September 1, 2017, Origin Bank conducted a public auction sale of the Airplane (the "Airplane Sale") in Houston, Texas where a third-party purchased the Airplane for $1,810,000.00.  (Adv. Dkt. 69-1, ¶ 38).

28.     Following the Airplane Sale, a deficiency balance remained due and owing to Origin Bank pursuant to the WHJ Loan Documents.  (Adv. Dkt. 69-1, ¶ 43).

29.     On October 17, 2017, Origin Bank sent a letter to Barrett (the "Demand Letter") setting forth the amounts owed under the WHJ Loan and demanding payment pursuant to the WHJ Guaranty.  (Adv. Dkt. 69-1, ¶ 44).

30.     Barrett did not repay the outstanding indebtedness that Origin Bank claimed was owed under the WHJ Loan.  (Adv. Dkt. 69-1, ¶ 45).

31.     On November 16, 2017, Origin Bank filed the Complaint (the "Initial Complaint") (Adv. Dkt. 2) in District Court seeking a judgment against Barrett for the deficiency balance owed under the WHJ Loan and for the amounts incurred by Origin Bank as a result of Barrett's alleged failure to comply with the WHJ Guaranty and the Settlement Agreement.

32.     Barrett filed Mitchell Chad Barrett's Answer and Defenses to Complaint (the "Answer to Initial Complaint") (Adv. Dkt. 106) on March 2, 2018.  In response to paragraph 6 of the Initial Complaint, Barrett "affirmatively plead[] that he did not agree to guaranty the [WHJ] Note and he did not sign the purported Commercial Guaranty."  (*Id.* at 6).  This statement in the Answer to Initial Complaint constituted the first notice to Origin Bank of Barrett's contention that he did not sign the WHJ Guaranty.  (Adv. Dkt. 69-1, ¶ 47).

33.     With permission from the District Court, Origin Bank filed the Amended Complaint (the "Amended Complaint") (Adv. Dkt. 17) on June 18, 2018.  Origin Bank attached as exhibits to the Amended Complaint:  (1) the WHJ Note; (2) the WHJ Loan Agreement; (3) the WHJ Guaranty; (4) the Aircraft Security Agreement; (5) the Settlement Agreement; (6) the Conversion Order and the Agreed Abandonment Order; (7) the U.C.C. Sale Notice; (8) the Warranty Bill of Sale, Certificate of Repossession of Encumbered Aircraft, General Release, and Aircraft Bill of Sale; and (9) the Demand Letter.

34.     Origin Bank alleges three counts in the Amended Complaint.  In Count I, Origin Bank alleges a breach of the WHJ Guaranty.[7]  (Adv. Dkt. 17 at 12-13).  In Count II, Origin Bank alleges that Barrett provided inaccurate or misrepresented information about his financial condition to induce Origin Bank to extend the WHJ Loan.  (Adv. Dkt. 17 at 13-14).  In Count III, Origin Bank alleges that Barrett conveyed his ownership interests in various entities, including Farm007, to family members or other insiders without sufficient consideration.  (Adv. Dkt. 17 at 14-15).  In its request for relief, Origin Bank alleges that as of November 16, 2017, Barrett owed Origin Bank $769,594.07 consisting of:  (a) $321,712.45 in principal owed under the WHJ Loan; (b) $200,221.85 in accrued unpaid interest (per diem $39.06); (c) $5,250.00 in unpaid late fees under the WHJ Loan; (d) $226,054.25 in attorneys' fees, cost and expenses incurred in connection with Origin Bank's enforcement of the WHJ Loan and WHJ Guaranty; and (e) $16,355.52 in costs and expenses incurred by Origin Bank to maintain and store the Airplane, obtain appraisal and log book/maintenance review in preparation for the Airplane Sale, prepare the Airplane for sale, and deliver the Airplane and title to the buyer after the Airplane Sale plus interest at the same daily rate as the WHJ Loan (per diem $39.06), attorneys' fees and expense, and court costs.  (Adv. Dkt. 17 at 17-18).

35.     Barrett filed Mitchell Chad Barrett's Answer and Defenses to Amended Complaint (the "Answer to Amended Complaint") (Adv. Dkt. 18) on July 2, 2018.  In response to paragraph 5 of the Amended Complaint, Barrett admitted that WHJ obtained the WHJ Loan and stated that "the exhibits attached to the Amended Complaint speaks [*sic*] for themselves."  (*Id.* at 6).  In

---

[7] Origin Bank does not allege a breach of the Settlement Agreement as a separate count in the Amended Complaint.

response to paragraph 6 of the Amended Complaint, Barrett again denied signing the WHJ Guaranty.  (*Id.*).

36.     On April 1, 2019, Barrett filed the Barrett Summary Judgment Motion and the Barrett Summary Judgment Brief, asserting that he neither signed the WHJ Guaranty nor authorized anyone to sign the WHJ Guaranty on his behalf; that "there is no genuine issue of material fact regarding the genuineness of the signature on the [WHJ] Guaranty"; and that he "is entitled to summary judgment as a matter of law."  (Adv. Dkt. 65).  The Barrett Summary Judgment Motion addresses only Count I of the Amended Complaint.  In support of the Barrett Summary Judgment Motion, Barrett submitted to the Court:  the WHJ Note (Adv. Dkt. 65-1); the WHJ Guaranty (Adv. Dkt. 65-2); excerpts from the Deposition of Mitchell Chad Barrett (the "Barrett Deposition") (Adv. Dkt. 65-3); and Mitchell Chad Barrett's Designation of Expert Witness, designating Steven G. Drexler ("Drexler") as an expert forensic document examiner (the "Expert Designation") (Adv. Dkt. 65-4).  Attached to the Expert Designation is a report containing Drexler's opinion that the disputed signature on the WHJ Guaranty was not written by Barrett (the "Drexler Report") (Adv. Dkt. 65-4 at 4-7).  On April 26, 2019, Origin Bank filed the Origin Response to Barrett Summary Judgment Motion and the Origin Brief in Support of Response to Barrett Summary Judgment Motion.  To the Origin Response to Barrett Summary Judgment Motion, Origin Bank attached the following exhibits:  the Affidavit of Randy Impson (the "Impson Affidavit") (Adv. Dkt. 82-1); Defendant's First Set of Interrogatories and Requests for Production of Documents Propounded to Plaintiff (Adv. Dkt. 82-9); the Barrett Deposition (Adv. Dkt. 82-10); selected documents filed in the WHJ Case and the Lead Bankruptcy Case (Adv. Dkt. 82-11); and the Terms Letter and Guaranty Modification Letter (Adv. Dkt. 82-12).  Barrett filed the Barrett Rebuttal and the Barrett Rebuttal Brief on May 3, 2019.

37.     On April 2, 2019, Origin Bank filed the Origin Summary Judgment Motion and the Origin Summary Judgment Brief, asserting that it reasonably relied on the terms and provisions of the Settlement Agreement; that "[i]t is undisputed that the [WHJ] Loan Documents, as well as the [WHJ] Guaranty, are valid and binding and that Barrett defaulted on his obligations thereunder"; and that "Origin is accordingly entitled to summary judgment in its favor and against Barrett on issue of Barrett's liability under the WHJ Loan pursuant to the [WHJ] Guaranty." (Adv. Dkt. 69 at 19). The Origin Summary Judgment Motion, like the Barrett Summary Judgment Motion, addresses only Count I of the Amended Complaint. In support of the Origin Summary Judgment Motion, Origin Bank submitted to the Court:  the Impson Affidavit (Adv. Dkt. 69-1); the WHJ Note (Adv. Dkt. 69-2); the Aircraft Security Agreement (Adv. Dkt. 69-3); a letter to U.S. Attorney Mary Helen Wall dated February 9, 2016 (Adv. Dkt. 69-4); the Agreed Stay Order (Adv. Dkt. 69-5); the Settlement Agreement (Adv. Dkt. 69-6); the Notification of Disposition of Collateral (Adv. Dkt. 69-7); the Demand Letter (Adv. Dkt. 69-8); Mitchell Chad Barrett's Responses to First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission Propounded by Origin Bank ("Barrett's Discovery Responses") (Adv. Dkt. 69-9); and the Barrett Deposition (Adv. Dkt. 69-10). On April 26, 2019, Barrett filed the Barrett Response to Origin Summary Judgment Motion and the Barrett Brief in Support of Response to Origin Summary Judgment Motion. To the Barrett Response to Origin Summary Judgment Motion, Barrett attached the following exhibits:  excerpts from the Barrett Deposition (Adv. Dkt. 80-1); Barrett's Discovery Responses  (Adv. Dkt. 80-2); the Expert Designation  (Adv. Dkt. 80-3); the Motion to Strike  (Adv. Dkt. 80-4); and the Brief in Support of Motion to Strike  (Adv. Dkt. 80-5).  Origin Bank filed the Origin Rebuttal Brief on May 3, 2019.

38.     Barrett filed the Motion to Strike and the Brief in Support of Motion to Strike on April 26, 2019, contemporaneously with the Barrett Response to Origin Summary Judgment Motion.  In support of the Motion to Strike, Barrett submitted to the Court:  the Impson Affidavit (Adv. Dkt. 78-1); excerpts from the Barrett Deposition (Adv. Dkt. 78-2); Barrett's Discovery Responses (Adv. Dkt. 78-3); and the Expert Designation (Adv. Dkt. 78-4).  Origin Bank filed the Origin Response to Motion to Strike and the Origin Brief in Support of Response to Motion to Strike on May 10, 2019.  Origin Bank attached the Impson Affidavit as an exhibit to the Origin Response to Motion to Strike.  (Adv. Dkt. 90-1).

## Introduction

In the Order entered on May 10, 2019 (the "Briefing Order") (Adv. Dkt. 89), Judge Reeves observed a factual dispute in the record as to whether Barrett personally guaranteed the WHJ Loan in 2013 but noted that "[i]t is not clear if that matters, however, since it is undisputed that in 2016 he signed a Release and Settlement Agreement 'absolutely and unconditionally guaranteeing the prompt and full repayment of all indebtedness' regarding the jet loan."  (*Id.* at 1).  Judge Reeves found that this agreement confirmed that Barrett is liable for the loan deficiency.  "*If* there is a trial before this Court, therefore, it will be held only to determine the appropriate amount of damages and attorney's fees."  (*Id.*).  Judge Reeves, moreover, questioned whether the District Court was the appropriate forum to resolve the parties' dispute because of the following forum selection provision in the Settlement Agreement:

> The Parties agree that all disputes and claims, not barred by applicable statutes of limitations, arising out of, relating to, resulting from, or concerning the Agreement shall be resolved by the Bankruptcy Court, and the Parties hereby consent to entry by the Bankruptcy Court of final judgment(s) to resolve such disputes and claims.

(*Id.*; Adv. Dkt. 69-6 at 25).  Judge Reeves directed the parties to file supplemental briefs addressing whether this case should be dismissed in deference to the adjudication of their dispute in this Court.

The parties filed supplemental briefs in which they agreed that this Court had jurisdiction to adjudicate and finally dispose of all claims in the Adversary. (Adv. Dkt. 94, 99). Additionally, however, Barrett filed Mitchell Chad Barrett's Motion for Clarification (the "Clarification Motion") (Adv. Dkt. 95) and Mitchell Chad Barrett's Memorandum in Support of Motion for Clarification (Adv. Dkt. 97) asking Judge Reeves to clarify whether the Briefing Order constituted a final ruling as to Barrett's liability.

On June 11, 2019, Judge Reeves entered the Referral Order transferring the case to this Court pursuant to the forum selection clause in the Settlement Agreement which "is binding and requires this case to be resolved by the Bankruptcy Court. Nothing in the [Clarification Motion] changes that fact." Judge Reeves noted in the Referral Order that despite his earlier finding on liability, this Court "is free to reconsider the evidence and law *de novo* should it identify any errors or omissions." (Adv. Dkt. 1 at 1). Judge Reeves' instructions require this Court to consider as a preliminary matter the scope of its authority under the law-of-the-case doctrine and the mandate rule.

"Under the law of the case doctrine, an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002). Without this doctrine, cases would end only when litigants became tired of re-asserting the same arguments over and over again. The doctrine has three recognized exceptions: (1) when the evidence on a subsequent trial was substantially different; (2) when controlling authority has since made a contrary decision of the law; and (3) when the decision was clearly erroneous and would work manifest injustice. *Propes v. Quarterman*, 573 F.3d 225, 228 (5th Cir. 2009).

The mandate rule is a specific application of the general doctrine of law of the case. The mandate rule "provides that a lower court on remand must implement both the letter and the spirit of the [appellate court's] mandate, and may not disregard the explicit directives of that court." *United States v. Becerra*, 155 F.3d 740, 753 (5th Cir. 1998), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005) (citation omitted). The Court interprets the Referral Order as a mandate from Judge Reeves to reconsider the evidence and law *de novo* for the limited purpose of identifying "any errors or omissions" in his finding that Barrett absolutely and unconditionally guaranteed the WHJ Loan. The Court conducts its analysis of the Cross-Motions for Summary Judgement mindful of that mandate. Since it affects the scope of the record that the Court may consider, the Court begins that analysis with the Motion to Strike.

## A.     Motion to Strike

Origin Bank attached the Impson Affidavit to the Origin Summary Judgment Motion (Adv. Dkt. 69-1), the Origin Response to Barrett Summary Judgment Motion (Adv. Dkt. 82-1), and the Origin Response to Motion to Strike (Dkt. 90-1). In the Impson Affidavit, Randy Impson ("Impson") states that he is senior vice president and senior credit officer of Origin Bank and also the custodian of Origin Bank's books and records. (Adv. Dkt. 69-1 at 1). In fifty-three (53) numbered paragraphs, Impson recites the terms and conditions of the WHJ Loan and the WHJ Guaranty, the DOJ's seizure of the Airplane on January 21, 2016, the default of the WHJ Loan and the WHJ Guaranty, the commencement of the WHJ Case, Origin Bank's efforts to locate and foreclose on the Airplane, the Settlement Agreement signed by Barrett, the broker's unsuccessful attempt to sell the Airplane, the sale of the Airplane by public auction for $1,801,000.00, and the balance owed under the WHJ Loan (Adv. Dkt. 69-1 at 1-16). Numerous exhibits are attached to the Impson Affidavit, including: (1) the WHJ Note, the WHJ Loan Agreement, and the WHJ

Guaranty (Adv. Dkt. 82-2); (2) the Aircraft Security Agreement (Adv. Dkt. 82-3); (3) a letter to Assistant U.S. Attorney Mary Helen Wall dated February 9, 2016 (Adv. Dkt. 82-4); (4) the Agreed Stay Order (Adv. Dkt. 82-5); (5) the Settlement Agreement  (Adv. Dkt. 82-6); (6) the Notice of Disposition of Collateral (Adv. Dkt. 82-7); and (7) the Demand Letter (Adv. Dkt. 82-8).  According to Impson, his recitation of facts is based on his review of these exhibits as well as other books and records "made at or near the time of the occurrence . . . by a person with knowledge of those matters or from information transmitted by a person with knowledge of those matters."  (Adv. Dkt. 69-1 at 2).  Barrett asks the Court to strike the Impson Affidavit in its entirety on the ground that Impson lacks personal knowledge of the loan transaction in question.

Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), as adopted by Rule 7056 of the Federal Rules of Bankruptcy Procedure, allows a party to provide an affidavit to support or oppose a motion for summary judgment.  FED. R. CIV. P. 56(c)(1)(A).  Affidavits supporting or opposing summary judgment, however, "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  Before Rule 56 was amended in 2010, the proper method to challenge an affidavit was to file a motion to strike.  *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 2738 (2016); *CMS Indus., Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 295 (5th Cir. 1981).  After the 2010 amendment, a motion to strike is unnecessary because under Rule 56(c)(2), a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *See* FED. R. CIV. P. 56(c)(2) advisory committee's note to 2010 amendment ("There is no need to make a separate motion to strike.").  As explained in the commentary, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the

proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* The Court thus treats the Motion to Strike as an objection to the Impson Affidavit under Rule 56(c)(2).

Barrett's specific objection to the Impson Affidavit is that Impson does not state that "he was personally involved in the loan transaction or in any of the actions described in the sixteen pages of facts contained in the [Impson] Affidavit." (Adv. Dkt. 79 at 3). Barrett focuses most of his arguments on Impson's statements regarding Barrett's agreement to guaranty the WHJ Loan. For example, in support of Count I of the Amended Complaint, Impson states in the Impson Affidavit, *inter alia*, that "Barrett agreed to enter into and execute in favor of Origin [Bank] a personal guarantee fully, unconditionally, and absolutely guaranteeing the repayment . . . of all indebtedness and obligations owed by WHJ to Origin [Bank]" (Adv. Dkt. 69-1, ¶ 6) and "Barrett's agreement to be personally liable for full repayment . . . is evidenced by . . . a *Commercial Guaranty*" (Adv. Dkt. 69-1, ¶ 7). Impson apparently bases these statements on the signature on the WHJ Guaranty. (Adv. Dkt. 69-2).

Barrett points out that Impson does not state that he actually saw Barrett sign the WHJ Guaranty or that he is familiar with Barrett's signature and can attest to its authenticity. According to Barrett, Impson acknowledges this limitation on the source of his knowledge in paragraph 53 of the Impson Affidavit:

> I declare under penalty of perjury that the foregoing is true and correct **to the best of my knowledge** and/or based upon my review of business records made and/or maintained by Origin [Bank] in the regular course of business as indicated hereinabove and/or **provided to me by others for this purpose**.

(Adv. Dkt. 79 at 3) (emphasis in Brief in Support of Motion to Strike). Barrett complains that although Impson states that he is aware of the existence of the documents attached to the Impson Affidavit as the custodian of records at Origin Bank, he does not state that he has personal

knowledge of the accuracy of the documents or of the loan transaction they purport to memorialize. Barrett contends that aside from Impson's statement that the WHJ Loan Documents and the WHJ Guaranty exist in Origin Bank's records, his "statement of facts and conclusions of law that make up the other forty eight or fifty paragraphs of the [Impson] Affidavit are simply matters counsel for Origin Bank hope[s] to prove at trial."   (Adv. Dkt. 79 at 5).   For these reasons, Barrett challenges the Impson Affidavit in its entirety.

The Court rejects Barrett's general contention that the Impson Affidavit is not based on Impson's personal knowledge.   The Fifth Circuit Court of Appeals has held that personal knowledge may be demonstrated by showing that the facts stated reasonably fall within the responsibility of the affiant as a corporate employee.   *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005).   Moreover, personal knowledge does not necessarily mean contemporaneous knowledge.   *Dalton v. FDIC*, 987 F.2d 1216, 1223 (5th Cir. 1993).   A custodian of records is competent to testify from the business records as a corporate representative.   *See* FED. R. EVID. 803(6); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000).   Impson is senior vice president, senior credit officer, and the custodian of records kept by Origin Bank in the ordinary course of its business.   The Court finds that Impson's review of the records provides a sufficient basis upon which to infer that he has personal knowledge of the facts contained in Origin Bank's business records, and these facts would be admissible at trial through his testimony in light of his position at Origin Bank.   *Crear v. Select Portfolio Servicing Inc.*, No. 18-10860, 2019 WL 316758, at *2 n.1 & *3 n.2 (5th Cir. Jan. 22, 2019).   "[T]he content of voluminous writings . . . that cannot be conveniently examined in court" may be presented in the form of a summary, provided that the documents on which it is based are made available "for examination or copying, or both."   FED. R. EVID. 1006; FED. R. BANKR. P. 9017.

The Court finds that Impson, as the custodian of the summarized records, is a witness with the requisite knowledge to testify that the attachments are what they claim to be. The statements within the Impson Affidavit relate to documents that are either exceptions to the rule against hearsay as records of regularly conducted activity or are self-authenticating. FED. R. EVID. 803(6), 902(a). Moreover, the statement by Impson in paragraph 53 of the Impson Affidavit that his testimony is based on "the best of my knowledge" has been held by the Fifth Circuit to satisfy the "personal knowledge" requirement of Rule 56. *See Perkins v. Bank of Am.*, 602 F. App'x 178, 181 (5th Cir. 2015) (holding that an affidavit based on the best of the affiant's knowledge and belief was sufficient).

The Federal Rules of Bankruptcy Procedure clearly contemplate the need for testimony by corporate officers on behalf of corporations by allowing the designation of officers, directors, or managing agents to testify on a corporation's behalf. Under Rule 30(b)(6) of the Federal Rules of Civil Procedure, as adopted by Rule 7030 of the Federal Rules of Bankruptcy Procedure, a corporate designee "does not testify as to his personal knowledge or perceptions." *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006). Rather, "he testifies 'vicariously,' for the corporation, as to its knowledge and perceptions." *Id.* Origin Bank asserts that if and when Barrett deposes Origin Bank, Impson would likely be designated as Origin Bank's representative. (Adv. Dkt. 91). Indeed, Impson signed the Origin POC filed by Origin Bank in the WHJ Case, which is consistent with his status as its corporate designee. The Court finds that his statements as to the contents of the exhibits attached to the Impson Affidavit constitute competent summary judgment evidence. Because the Impson Affidavit satisfies Rule 56(c)(4), the Court finds that the Motion to Strike should be denied.

In support of his argument, Barrett relies on three cases rendered by Mississippi courts interpreting the personal knowledge requirement of Rule 56 of the Mississippi Rules of Civil Procedure.  (Adv. Dkt. 79 at 4-5).  But the Federal Rules of Bankruptcy Procedure (and the Federal Rules of Civil Procedure to the extent of their incorporation) apply in adversary proceedings.  *See* FED. R. BANKR. P. 1001; *Hanna v. Plumer*, 380 U.S. 460, 473-74 (1965).  Moreover, although the Mississippi Rules of Civil Procedure are modeled generally after the Federal Rules of Civil Procedure, Rule 56 as amended in 2010 differs considerably from the version of Rule 56 in the Mississippi Rules of Civil Procedure.  Although the standard for granting summary judgment was not changed in 2010, the amendments to Rule 56 sought "to improve the procedures for presenting and deciding summary-judgment motions."  *See* FED. R. CIV. P. 56 advisory committee's note to 2010 amendment.  So, for example, there is no counterpart to Rule 56(c)(2) of the Federal Rules of Civil Procedure in the Mississippi Rules of Civil Procedure.  For these reasons, the Court does not find the Mississippi authority cited by Barrett to be persuasive or even helpful.

Having denied the Motion to Strike, the Court now turns to the Cross-Motions for Summary Judgment.  The Court begins that discussion with a description of the applicable standard of review.

## B.  Summary Judgment Standard

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Further, to prevail on a motion for summary judgment, a party must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials." Fᴇᴅ. R. Cɪᴠ. P. 56(c)(1)(A).

The movant carries the burden "of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Put simply, "there are two (2) elements that must be met in order for summary judgment to be appropriate: (1) there must be no genuine dispute of the material fact; and (2) the undisputed facts are such that the movant is entitled to judgment as a matter of law." *Greenpoint AG, LLC v. Kent (In re Kent)*, 554 B.R. 131, 139 (Bankr. N.D. Miss. 2016). The Court looks to the substantive law to determine if a fact is material. *Id.* at 139-40.

If the movant meets the initial burden, "the burden of production shifts to the nonmovant who then must rebut the presumption by coming forward with specific facts, supported by the evidence in the record, upon which a reasonable factfinder could find a genuine fact issue for trial." *Quackenbush v. U.S. Dep't of Educ. (In re Quackenbush)*, No. 16-00044-NPO, 2018 WL 4056993, at *3 (Bankr. S.D. Miss. Aug. 24, 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Summary judgment is proper where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she

has the burden of proof." *Celotex Corp.*, 477 U.S. at 323.  On cross-motions for summary judgment, a court reviews each party's motion independently, viewing the evidence and inferences in the light most favorable to the non-moving party.  *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## C.    Choice of Law

As a threshold matter, this Court must determine which state's substantive law applies to Origin Bank's breach-of-guaranty claim.  The parties largely cite the substantive law of Mississippi in their briefs without discussing why they made that choice.[8]

The Fifth Circuit has not resolved whether courts exercising bankruptcy jurisdiction should apply forum (here, Mississippi) or federal choice-of-law rules.  *Fishback Nursery, Inc. v. PNC Bank*, 920 F.3d 932, 935 (5th Cir. 2019).  Because both Mississippi and federal choice-of-law rules follow the Second Restatement of Conflicts, the Court finds it unnecessary to choose between them.  *See Rieger v. Group Health Ass'n*, 851 F. Supp. 788, 791 (N.D. Miss. 1994); *FDIC v. Massingill*, 24 F.3d 768, 775 (5th Cir. 1994).

The choice-of-law provision in the WHJ Guaranty declares that "[t]his Guaranty will be governed by federal law applicable to the Lender and, to the extent not preempted by federal law, the laws of the State of Louisiana without regard to its conflicts of law provisions."  (Adv. Dkt. 69-2 at 13).  Section 187(2) of the Second Restatement of Conflicts provides that the law of the state chosen by the parties to govern their contractual rights applies unless: (1) the chosen state has "no substantial relationship" to the parties or the transaction or (2) application of the law of the

---

[8] A few citations to Louisiana statutes and cases appear in footnotes in the Origin Brief in Support of Response to Barrett Summary Judgment Motion (Adv. Dkt. 83 at 4 n.9, 5 n.11, 19 n.46) and in the Origin Summary Judgment Brief (Adv. Dkt. 70 at 9 n.9, 12 n.18, 13 n.19).

chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. RESTATEMENT (SECOND) OF CONFLICTS § 187; *see also Sorrels Steel Co. v. Great Sw. Corp.*, 906 F.2d 158, 167 (5th Cir. 1990). The comment to section 187 of the Second Restatement of Conflicts, however, limits the scope of its provisions to "situations where it is established to the satisfaction of the forum that the parties have chosen the state of the applicable law." RESTATEMENT (SECOND) OF CONFLICTS § 187 cmt. a. In light of Barrett's sworn testimony that the signature on the WHJ Guaranty is not his, the Court finds that the choice-of-law provision in the WHJ Guaranty is not binding unless and until the Court determines that the WHJ Guaranty is valid.

In the absence of an effective choice-of-law by the parties, the Second Restatement of Conflicts states, in relevant part, that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties." RESTATEMENT (SECOND) OF CONFLICTS § 188(1). Under the framework of § 188(2) of the Second Restatement of Conflicts, the Court must consider the following contacts: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Next, the Court must consider the principles enumerated in § 6(2) of the Second Restatement of Conflicts, which include: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f)

certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.  RESTATEMENT (SECOND) OF CONFLICTS § 6(2).

Barrett was a resident of Mississippi at the time of the loan transaction and now lives in Florida; WHJ is a Mississippi corporation with its principal place of business located at the Jackson-Evers International Airport in Jackson, Mississippi; the Airplane was hangered in Mississippi; the Settlement Agreement was negotiated and executed in Mississippi; Origin Bank is a Louisiana banking corporation; and the choice-of-law provisions in the WHJ Note and WHJ Loan Agreement state that they were "accepted" in Louisiana.  (Adv. Dkt. 69-2, 69-10 at 14). Although there are contacts in both Mississippi and Louisiana, the Court finds that Mississippi has the most significant relationship to the parties and the loan transaction.  Moreover, applying the principles of section 6(2) of the Second Restatement of Conflicts, the Court finds that Mississippi law should apply given the interests of Mississippi as the forum state.  These findings are consistent with the parties' reliance on Mississippi law in their motions, responses, and briefs.  Regardless, whether Mississippi or Louisiana applies to the breach-of-guaranty claim does not create any substantial disparity in the results reached by the Court.  *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2002).

## D.    Cross-Motions for Summary Judgment

Barrett and Origin Bank both seek summary judgment as to Count I of the Amended Complaint on Origin Bank's claim for damages for Barrett's alleged breach of the WHJ Guaranty. To establish its claim, Origin Bank has the burden to show that:  (1) Barrett signed the WHJ Guaranty; (2) the WHJ Guaranty encompasses WHJ's obligations under the WHJ Loan Documents; (3) Origin Bank is the current holder and owner of the WHJ Note; (4) the WHJ Note is in default; and (5) the conditions (if any) of Barrett's liability—as laid out in the WHJ

Guaranty—have been met. *Edwards Family P'ship, Ltd. v. Dickson*, 821 F.3d 614, 618 (5th Cir. 2016) (applying Mississippi law). Only the first element—whether Barrett signed the WHJ Guaranty—is in dispute. Barrett contends there is no genuine dispute that he did not sign the WHJ Guaranty, whereas Origin Bank asserts that there is no genuine dispute that Barrett did in fact sign the WHJ Guaranty and, regardless, the doctrines of ratification, equitable estoppel, and judicial estoppel preclude Barrett from denying the validity of the WHJ Guaranty.

  **1.**    **Barrett Summary Judgment Motion**

  Barrett alleges that Origin Bank cannot prove the "threshold material fact" that he signed the WHJ Guaranty. (Adv. Dkt. 66 at 3). Barrett testified in his deposition that the signature on the WHJ Guaranty is not his, that he does not know who signed his name, that he did not authorize anyone to sign his name to the WHJ Guaranty, and that he has never authorized anyone to sign his name for any reason, as follows:

> Q   On page 4 of that document where the signature line is reflected it states, in the last line of the paragraph, "This guaranty is dated November 27, 2013. The line is there for guarantor, Mitchell C. Barrett, and there is a signature reflected there.
> Is that your signature?
>
> A   No, it is not.
>
> Q   Okay. Do you know who signed this document for you?
>
> A   I do not.
>
> Q   Okay. So did anyone who worked for you or in your office have your permission to sign for you at any point in time?
>
> A   No.

(Adv. Dkt. 65-3 at 7-8). According to Barrett, Origin Bank has presented no evidence that contradicts his sworn testimony. In the absence of proof by Origin Bank that he did in fact sign the WHJ Guaranty, Barrett contends that he is entitled to summary judgment.

As additional evidence that he did not sign the WHJ Guaranty, Barrett submits the Expert Designation, which identifies Drexler as a forensic document and handwriting examiner, certified by the American Board of Forensic Document Examiners.  Barrett retained Drexler to examine Barrett's disputed signature on the WHJ Guaranty.  (Adv. Dkt. 65-4).  In the Drexler Report dated August 27, 2018, Drexler describes his qualifications and methodology and concludes that the disputed signature on the WHJ Guaranty was not written by Barrett.  He bases his conclusion on a comparison of the signature on the WHJ Guaranty with samples of Barrett's known signature. Below are the first two signatures that appear in "figure 3" of the Drexler Report:



as of Lake Bruin, LLC

hell Chad Barrett, Manager

(Adv. Dkt. 65-4 at 10).  The disputed signature on the WHJ Guaranty appears above Barrett's known signature.  As a result of his comparison of the above signatures, Drexler found that there were significant inconsistencies with respect to the following characteristics:  slant, spacings, skill, legibility, height ratios, speed, size of writing, baseline agreement, habit, beginning strokes, ending strokes, and letterforms.  (Adv. Dkt. 65-4 at 6).  Origin Bank has not designated an expert in the field of forensic document examination and/or handwriting analysis to refute Drexler's qualifications, his methodology, or his findings.  (Adv. Dkt. 66 at 5-6).

To the extent that Origin Bank alleges that he entered into a verbal agreement to guaranty the WHJ Loan, Barrett invokes Mississippi's Statute of Frauds, MISS. CODE ANN. § 15-3-1.  That statute provides that certain contracts are not enforceable unless they are in writing and signed

either by the person to be charged with that promise or by someone authorized in writing by that person to sign the contract for him.  Among those contracts is "any special promise to answer for the debt or default or miscarriage of another person."  Miss. Code Ann. § 15-3-1(a).  The Mississippi Supreme Court has defined a guaranty as an agreement providing for the payment of a note in the event of the maker's default in payment.  *Powell v. Sowell*, 145 So. 2d 168, 171 (Miss. 1962).  According to Barrett, the promise that Origin Bank alleges that he made and that Origin Bank seeks to enforce is a guaranty agreement that falls within Mississippi's Statute of Frauds and, therefore, is unenforceable in the absence of a signed, written contract.  (Adv. Dkt. 66 at 5).

In response, Origin Bank describes Barrett's allegation that he did not sign the WHJ Guaranty as "unfounded" and "hollow."  (Adv. Dkt. 83 at 1, 4).  Origin Bank raises numerous arguments that it contends both support the denial of the Barrett Summary Judgment and the entry of summary judgment in its favor as to the genuineness of Barrett's signature.[9]  In summary, they are:  (1) a presumption of validity arises by virtue of the Impson Affidavit; (2) Barrett lacks credibility; (3) Barrett admitted in the Answer to Amended Complaint that he signed the WHJ Guaranty; (4) the Drexler Report does not conclusively establish that Barrett's signature is a forgery; and (5) Mississippi law does not release Barrett from liability in the absence of evidence of fraud by Origin Bank.  The Court addresses each argument separately below.

### a.        Presumption of Validity & the Impson Affidavit

Origin Bank cites *Hill v. Consumer National Bank*, 482 So. 2d 1124, 1128 (Miss. 1986), for the proposition that "a lender may establish the valid and binding nature of loan documents" by an affidavit demonstrating:  (a) that the note was executed by the borrower; (b) that the note

---

[9] Origin Bank's arguments that rely on the doctrines of ratification, equitable estoppel, and judicial estoppel are addressed later in this Opinion.

was held by the lender; (c) that the note was not paid when due and remained outstanding as of the date of the affidavit; and (d) the amount owed under the note on any given date.  (Adv. Dkt. 83 at 4-5).  Origin Bank contends that it has established the validity of the WHJ Guaranty through the Impson Affidavit to which are attached the following exhibits:  (1) the WHJ Note, the WHJ Loan Agreement, and the WHJ Guaranty (Adv. Dkt. 82-2); (2) the Aircraft Security Agreement (Adv. Dkt. 82-3); (3) a letter to Assistant U.S. Attorney Mary Helen Wall dated February 9, 2016 (Adv. Dkt. 82-4); (4) the Agreed Stay Order (Adv. Dkt. 82-5); (5) the Settlement Agreement  (Adv. Dkt. 82-6); (6) the Notice of Disposition of Collateral (Adv. Dkt. 82-7); and (7) the Demand Letter (Adv. Dkt. 82-8).  According to Origin Bank, the Impson Affidavit and its attached exhibits conclusively show:  (1) that the WHJ Note was obtained by WHJ; (2) that the WHJ Guaranty was executed by Barrett; (3) that Origin Bank holds the WHJ Note; (4) that the WHJ Note was not paid when due and remains outstanding; and (5) the amount owed under the WHJ Note.  (Adv. Dkt. 83 at 4-6).  In response, Barrett re-argues his Motion to Strike the Impson Affidavit, again challenging the scope of Impson's personal knowledge.  (Adv. Dkt. 84).

Origin Bank appears to interpret *Hill* as holding that affidavits from custodians of records create an *irrebuttable* presumption as to the validity of *all* loan documents.  Origin Bank's reliance on *Hill* is misplaced for two reasons.  First, the Mississippi Supreme Court in *Hill* held that the affidavit established a *prima facie* case as to the lender's entitlement to judgment and that summary judgment in favor of the lender was proper because of the absence of any sworn affirmative defense.  The Mississippi Supreme Court thus treated the presumption raised by the affidavit as rebuttable, rather than irrebuttable, meaning that the presumption in favor of the lender would have disappeared if the borrower had introduced some evidence of grounds for the denial of his personal

liability. Here, unlike in *Hill*, there is sworn deposition testimony from Barrett that would rebut any presumption raised by the Impson Affidavit.

The second reason why Origin Bank's reliance on *Hill* is misplaced is because the Mississippi Supreme Court held that the presumption arose by virtue of section 75-3-403(2)(a) of the Mississippi Code, the current version of which is codified at section 75-3-402(b)(2). The borrower in *Hill* argued in defense of his personal liability that he executed the promissory note in question only in a representative capacity on behalf of a corporation in which he had an interest. Section 75-3-402(b)(2), adopted from Article 3 of the Uniform Commercial Code ("U.C.C."), reads as follows:

> An authorized representative who signs his own name to an instrument is personally obligated if the instrument neither names the person represented nor shows that the representative signed in a representative capacity.

MISS. CODE ANN. § 75-3-402(b)(2). The Mississippi Supreme Court interpreted the above language as creating a presumption in favor of the lender. Article 3 of the Mississippi U.C.C., MISS. CODE ANN. §§ 75-3-101 to 75-3-605, however, does not apply to *all* loan documents but only to negotiable instruments. MISS. CODE ANN. § 75-3-102. Unlike the promissory note in *Hill*, the WHJ Guaranty is not a negotiable instrument governed by the Mississippi U.C.C. *Uniwest Mortg. Co. v. Dadecor Condos, Inc.*, 877 F.2d 431, 434-35 (5th Cir. 1989). The WHJ Guaranty purportedly was executed by Barrett in his individual capacity in a contract that is separate from the WHJ Note. "A guarantor who simply guarantees an instrument in a separate contract has not engaged in a transaction within the UCC." *Id.* at 434 (citation & quotation omitted); *see F.D.I.C. v. Nobles*, 901 F.2d 477, 480 (5th Cir. 1990). There are policy considerations why a signature on a negotiable instrument is presumed to be genuine under the U.C.C., such as enhancing the

negotiability of commercial paper, that are not advanced by applying the presumption to a separate guaranty agreement.  *See* MISS. CODE ANN. § 75-3-308.

Thus, the common law of Mississippi (rather than the U.C.C.) applies in determining the enforceability of the WHJ Guaranty.  No presumption, whether rebuttable or irrebuttable, arises under the common law of Mississippi to relieve Origin Bank of its burden of establishing by a preponderance of the evidence the genuineness of Barrett's signature on the WHJ Guaranty. *Dickson*, 821 F.3d at 618.  Accordingly, the Court finds that the Impson Affidavit does not show the absence of a genuine dispute entitling Origin Bank to summary judgment as to the genuineness of Barrett's signature.

### b.   Lack of Credibility

Next, Origin Bank attempts to impugn Barrett's testimony by pointing out his receipt or execution of other documents that refer to the WHJ Guaranty, including the Terms Letter provided to Barrett five days in advance of the execution of the WHJ Guaranty, the Notice of Final Agreement signed by Barrett on November 27, 2013, the Guaranty Modification Letter dated March 30, 2015, and the MSA signed by Barrett on April 13, 2015.  Both the Terms Letter and the Notice of Final Agreement identify Barrett as a guarantor, and the Guaranty Modification Letter releases Rutland and Bennett, but not Barrett, as guarantors of the WHJ Loan.  The Court finds that such evidence raises a credibility issue as to whether Barrett signed the WHJ Guaranty.  The existence of this genuine dispute defeats summary judgment in favor of either Barrett or Origin Bank as to the genuineness of Barrett's signature.

### c.   Barrett's Admissions

Origin Bank also relies on the Answer to Amended Complaint where Barrett admitted that WHJ obtained the WHJ Loan and further responded that "the exhibits attached to the Amended

Complaint speaks [*sic*] for themselves." (Adv. Dkt. 18 at 6). Origin Bank attached nine exhibits to the Amended Complaint, including the WHJ Guaranty. Origin Bank treats Barrett's response as an admission that he signed the WHJ Guaranty. Barrett denies that he conceded the authenticity of any signatures on the exhibits. (Adv. Dkt. 80 at 3).

The Court disagrees with Origin Bank's interpretation of Barrett's answers. Although a litigant's failure to deny that documents are what they purport to be, combined with a statement that the documents "speak for themselves," may constitute an admission as to their authenticity, the Court finds that Barrett did not admit that he signed any of the exhibits attached to the Amended Complaint, including the WHJ Guaranty. In his response to paragraph 6 of the Amended Complaint in which Origin Bank alleged that he executed the WHJ Guaranty, Barrett denied the allegation and "affirmatively plead[] that he did not agree to guaranty the [WHJ] Note and he did not sign the purported Commercial Guaranty." (Adv. Dkt. 18 at 6). Additionally, the Answer to Amended Complaint included an affirmative defense that Origin Bank "has committed fraud and has unclean hands because it has presented a false document to this court in the form of a commercial guaranty that was not signed by the Defendant." (Adv. Dkt. 18 at 3). Fairly read, Barrett's statement in the Answer to Amended Complaint that the exhibits "speaks [sic] for themselves" is an admission only that the WHJ Guaranty was signed by someone—an undisputed fact.[10] It is not an admission that Barrett executed the WHJ Guaranty.

---

[10] Whether an answer to an allegation in a complaint that a written document "speaks for itself" satisfies the minimum pleading standards of Rule 7008(b) of the Federal Rules of Bankruptcy is not before the Court. "This [c]ourt has been attempting to listen to such written materials for years (in the forlorn hope that one will indeed give voice)—but until some such writing does break its silence, this [c]ourt will continue to require pleaders to employ one of the three alternatives that are permitted by Rule 8(b)." *State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 276, 279 (N.D. Ill. 2001).

### d.   Lack of Conclusiveness of Drexler Report

Origin Bank argues that even in the absence of an expert opinion refuting Drexler's opinion, the Drexler Report presents a question for the trier of fact at trial.  (Adv. Dkt. 83 at 18). Origin Bank relies on the Mississippi Supreme Court's holding in *Clark v. Lansford*, 191 So. 2d 123 (Miss. 1966), that the weight and conclusiveness of opinions offered by handwriting analysists depend on the "character, capacity, skill, and opportunity for observation of the expert, and the cogency of reasons given by him for his opinion . . . [which] is essentially a question for the trier of facts."  *Id.* at 125.  Origin Bank also relies on the Mississippi Supreme Court's holding in *In re Rumley's Estate*, 106 So. 2d 678 (Miss. 1958), that the value of an expert's opinion on handwriting depends largely on grounds upon which his opinion is based, and the reasons for such opinion are questions for the trier of fact.  *Id.* at 679-80.  Barrett dismisses Origin Bank's argument as an attempt to discredit Drexler's opinion with legal arguments rather than proper summary judgment evidence.  (Adv. Dkt. 84 at 2).

The Court does not find *Clark* and *Rumley's Estate* persuasive for two reasons.  First, both cases were decided before the adoption of the Mississippi Rules of Evidence.  The Order Adopting the Mississippi Rules of Evidence, effective January 1, 1986, states that the Mississippi Rules of Evidence "shall be, and . . . are adopted as rules of evidence governing proceedings in the courts of the State of Mississippi to the extent and with the exceptions provided in said rules."  Rule 1103 of the Mississippi Rules of Evidence adds that "[a]ny evidentiary rule in a statute, court decision, or court rule that is inconsistent with the Mississippi Rules of Evidence is hereby repealed."  Miss. R. Evid. 1103.   Rule 702 of the Mississippi Rules of Evidence, which has governed the admissibility of expert testimony since January 1, 1986, abrogated the holdings in *Clark* and

*Rumley's Estate* regarding the weight and conclusiveness of opinions offered by handwriting experts.

The second reason why the Court rejects *Clark* and *Rumley's Estate* as persuasive authority is because the weight and conclusiveness of Drexler's opinion are governed not by the Mississippi Rules of Evidence but by the Federal Rules of Evidence.  Rule 9017 of the Federal Rules of Bankruptcy Procedure provides:  "The Federal Rules of Evidence . . . apply in cases under the [Bankruptcy] Code."  FED. R. BANKR. P. 9017.  The Court, therefore, considers Origin Bank's challenge to Drexler's opinion testimony under Rule 702 of the Federal Rules of Evidence ("Rule 702").

Origin Bank maintains that the Drexler Report lacks any in-depth discussion of the forensic standards used by Drexler to arrive at his conclusion that the signature on the WHJ Guaranty was not written by Barrett.  (Adv. Dkt. 83 at 18).  Origin Bank does not contest Drexler's competency or his background qualifications to testify as an expert in the field of forensic document examination and, moreover, does not question the scientific reliability of handwriting analysis in general or suggest that Drexler's handwriting analysis cannot meet the requirements of Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the *Daubert* factors may be useful in scrutinizing non-scientific expertise).   Instead, Origin Bank challenges the reliability of the methodology employed by Drexler to determine conclusively that Barrett did not sign the WHJ Guaranty.  *See Wolf v. Ramsey*, 253 F. Supp. 2d 1323 (N.D. Ga. 2003) (examining the methodology employed by a handwriting analyst to support a categorical conclusion as to the identity of the writer of a ransom note).  Origin Bank asks the Court to limit its consideration of Drexler's

testimony to his comparison of the characteristics of the disputed signature with Barrett's known signatures.

The Court rejects Origin Bank's contention that the opinions of handwriting experts raise questions of fact in all circumstances. The Court finds instead that under these circumstances Drexler's Report is not dispositive of the issue. Drexler devotes less than two pages of the Drexler Report explaining his methodology before reaching the conclusion that the signature on the WHJ Guaranty was not written by Barrett. Handwriting analysis is not a science *per se* but is based on two precepts, that "[n]o two people write exactly alike, and no one person writes exactly the same every time." *United States v. Mallory*, 902 F.3d 584, 594 (6th Cir. 2018); *see Daubert*, 509 U.S. at 590. The Court finds that cross-examination of Drexler at trial is necessary to determine the reliability of his application of these precepts of handwriting analysis to his comparison of Barrett's disputed signature and his known signature. Accordingly, the Court will not consider Drexler's opinion that Barrett did not sign the WHJ Guaranty as dispositive of that issue. The Court finds instead that the Drexler Report creates a genuine issue of material fact as to whether Barrett signed the WHJ Guaranty and thus cannot support summary judgment in favor of Barrett.[11]

### e.   Absence of Fraud by Origin Bank

Origin Bank next argues that even assuming that Barrett did not sign the WHJ Guaranty, he still would not be entitled to judgment as a matter of law because Mississippi law does not release guarantors from liability "even where the guarantor's signature is obtained by fraud of the principal debtor outside of his demonstration and proof by competent evidence that the lender

---

[11] Regardless, the Drexler Report does not address the question whether Barrett authorized someone to sign his name to the WHJ Guaranty. Barrett denied that he did so in his deposition testimony but there is evidence in the record regarding his early involvement in the loan transaction that suggests otherwise.

actively participated in and/or had actual knowledge of such fraud." (Adv. Dkt. 83 at 6). Origin Bank cites *Cresap v. Furst & Thomas*, 105 So. 848, 849 (Miss. 1925), for this proposition and points out that Barrett has not submitted any evidence suggesting that WHJ caused the WHJ Guaranty to be executed by fraud or that Origin Bank participated in any such fraud. Barrett views Origin Bank's reliance on *Cresap* as an improper attempt to shift the burden of proving Origin Bank's lack of involvement in the purported fraud from Origin Bank onto Barrett, the non-moving party. (Adv. Dkt. 81 at 9).

The Court finds the facts in *Cresap* distinguishable. G.W. Cresap ("Cresap") signed the guaranty after it was represented to him that P.L. Lomineck and J.A. Lomineck already had signed the guaranty as additional guarantors. The signature of J.A. Lomineck, however, was forged. In an action against Cresap to enforce the guaranty, Cresap argued that the guaranty was unenforceable because he would not have signed it if he had known about J.A. Lomineck's forged signature. The Mississippi Supreme Court disagreed, holding that a guarantor whose signature is obtained by fraud is not released from liability unless the guarantee participated in or had knowledge of the fraud. *Cresap*, 105 So. at 849.

Whereas Barrett denies signing the WHJ Guaranty, Cresap admitted signing the guaranty but alleged he was induced by fraud to sign the guaranty. In *Cresap*, the action to enforce the guaranty was brought against Cresap, whose signature was not forged, but here the action to enforce the WHJ Guaranty is brought against Barrett whose signature purportedly was forged. Origin Bank does not cite any Mississippi case, and the Court itself has not found one, where a written guaranty was deemed enforceable against the individual whose signature was forged for the singular reason that the lender was not an active participant in the admitted fraud. The Court finds that *Cresap* does not support Origin Bank's argument.

### f.      Summary

The Court finds that notwithstanding Barrett's deposition testimony and the Drexler Report, there is a genuine dispute as to whether Barrett signed the WHJ Guaranty or authorized someone else to sign it on his behalf.  Such evidence defeats summary judgment in favor of either Barrett or Origin Bank as to the issue of the genuineness of Barrett's signature.  This finding is consistent with Judge Reeves' observation in the Briefing Order that there is a factual dispute in the record as to whether Barrett personally guaranteed the WHJ Loan.  The Court finds no error or omission in that observation.

Even if there was no genuine dispute that the signature on the WHJ Guaranty is a forgery, Origin Bank argues that the doctrines of ratification, equitable estoppel, and/or judicial estoppel prevent Barrett from denying the validity of the WHJ Guaranty.  The Court finds that those arguments have merit, particularly given that Barrett's conduct after he became aware of the purported forgery occurred while he was represented by counsel.  The Court addresses Origin Bank's arguments below in the context of the Origin Summary Judgment Motion where they are developed more fully in the parties' briefing.  For the above reasons and for the reasons discussed below, the Court finds that the Barrett Summary Judgment Motion should be denied.

### 2.      Origin Summary Judgment Motion

Origin Bank argues numerous reasons why it is entitled to summary judgment.  Its first argument is that the Impson Affidavit creates an irrebuttable presumption as to the validity of the WHJ Guaranty.  The Court already has considered and rejected that argument in the above discussion.[12]  Origin Bank's next three arguments have more substance.  Origin Bank insists that Barrett "again, and again, and again did in fact agree to be fully, absolutely, and unconditionally

---

[12] *See supra* at 33-36.

responsible for repayment of the . . . WHJ Loan." (Adv. Dkt. 82 at 3). Because of this conduct, Origin Bank contends that Barrett either ratified the WHJ Guaranty or, in the alternative, is estopped both equitably and judicially from denying its enforceability.

### a. Ratification

Citing section 75-3-403(a) of the Mississippi Code, which allows an "unauthorized signature" to be ratified "for all purposes," Origin Bank argues that Barrett ratified the signature on the WHJ Guaranty. MISS. CODE ANN. § 75-3-403(a) (adopted from the U.C.C.); (Adv. Dkt. 83 at 19). An "unauthorized signature" is defined in section 75-1-201(b)(41) of the Mississippi Code as one that includes a forgery as well as a signature made without actual or apparent authority. The official comment to U.C.C. § 3-403, not included in the Mississippi codification, explains that this provision settles a conflict among various jurisdictions as to whether a forgery may be ratified.

Because the WHJ Guaranty is not a negotiable instrument governed by the U.C.C., Origin Bank's reliance on section 75-3-403(a) of the Mississippi Code is misplaced. For its defense of ratification, Origin Bank must find support in the common law of Mississippi. Still, "[t]he meaning of ratification for purposes of negotiable instruments law is not dissimilar from its general meaning in the law of agency." *Polles v. FDIC*, 749 F. Supp. 136, 139 (N.D. Miss. 1990) (citation & quotation omitted).

The doctrine of ratification is founded on agency law. *Gulf Ref. Co. v. Travis*, 30 So. 2d 398, 399 (Miss. 1947). Under Mississippi law, ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Gulf Ref. Co.*, 30 So. 2d at 399-400 (citing RESTATEMENT (FIRST) OF AGENCY § 82). Inaction can result in ratification "where the principal has notice that others will infer from his silence that he intends to

manifest his assent to the act." *Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792, 797 (Miss. 2011).

A question arises as to whether Barrett may ratify the WHJ Guaranty under the common law of Mississippi when the evidence does not show who signed Barrett's name. Previously, under the Second Restatement of Agency, an actor could ratify an act only if the actor *purported to act* as an agent. RESTATEMENT (SECOND) OF AGENCY § 4.03. One reason for the "purported to act" requirement was that a person could not ratify a forgery. *Id.* § 4.03 cmt. c. In contrast, under the Third Restatement of Agency, "[a] person may ratify an act if the actor *acted* or purported to act as an agent on the person's behalf." RESTATEMENT (THIRD) OF AGENCY § 4.03 (emphasis added). As a result of this additional language, a principal may ratify a forgery.

Mississippi courts routinely look to the Third Restatement of Agency for guidance. *Northrop Grumman Ship Sys., Inc., v. Ministry of Defense of The Republic of Venezuela*, 575 F.3d 491, 500 (5th Cir. 2009). Moreover, it appears that Mississippi has adopted the position of the Third Restatement of Agency that a person may ratify a forgery. Citing a different provision of the Third Restatement of Agency, the Mississippi Supreme Court in *Northlake* recognized ratification as a means of validating an otherwise void deed of trust. *Northlake*, 60 So. 3d at 797. The Court thus finds that Mississippi law would allow the ratification of even a forgery. The Court next examines the evidence that allegedly supports Origin Bank's affirmative defense.

In the absence of Barrett's explicit ratification of the WHJ Guaranty, Origin Bank relies on evidence of Barrett's actions and inactions both before and after he allegedly first became aware of the forgery in late July 2016. As to his conduct before his alleged discovery of the forgery, Barrett testified that he knew about the WHJ Loan and the purchase of the Airplane from the proceeds of the WHJ Loan. He admitted providing personal financial statements to Origin Bank

and signing the Notice of Final Agreement that identified him as a guarantor of the WHJ Loan. At that time, he was a member of WHJ and president of WHI. Barrett extensively used the Airplane to promote his pharmaceutical companies operating under the umbrella of WHI. "Well, I was usually the one that needed to go somewhere more than anybody else because they wanted to see the face of the company, and that's what I was." (Adv. Dkt. 69-10 at 4). Then, in 2015, when he relinquished his interest in WHI and became the sole member of WHJ, he enjoyed the exclusive use of the Airplane until January 2016 when it was seized by the DOJ. In July 2016, Barrett executed the Settlement Agreement acknowledging that he signed the WHJ Guaranty as security for repayment of the WHJ Loan.[13] (Adv. Dkt. 69-10 at 20). As part of the settlement, Barrett agreed to pay for all costs to hangar, store, maintain, pilot (for test runs), market, and sell the Airplane.

Barrett testified that the first time he saw the signature on the WHJ Guaranty and realized it was a forgery "was after I settled with Origin Bank in '16." (Adv. Dkt. 69-10 at 12). Barrett later clarified that it was "[s]ometime around July, late July." (Adv. Dkt. 69-10 at 24). He described how he discovered the purported forgery, as follows:

> I think I was just gathering—gathering stuff up because I had all of this—I had papers upon papers. My desk looks like this because I've got a lot going on. . . . And—and then I flipped through this, and I was like—I didn't know what it was at first. And then I read it and, you know, realized what it was and what it wasn't.

(*Id.*).

In effect, Origin Bank argues that the above facts demonstrate that Barrett was in the best position to know if the signature on the WHJ Guaranty was his and that his ignorance of the forged

---

[13] Barrett has not filed a motion attempting to vacate or set aside the Settlement Agreement although he contends that he signed the Settlement Agreement "under the mistaken belief that he had guaranteed the WHJ loan." (Adv. Dkt. 81 at 15); *see Nat'l City Golf Fin. v. Golf Cars of Miss., LLC*, No. 3:08-cv-600-HTW-LRA, 2017 WL 5652386 (S.D. Miss. Mar. 29, 2017).

signature was willful. *See Gulf Ref. Co.*, 30 So. 2d at 400. Mississippi case law, however, indicates that ratification generally must be based on conduct occurring after the discovery of the alleged fraud. "Ratification is a principal's *after-the-fact* conscious decision to be bound by an agent's unauthorized act, and it is that decision that can trigger the principal's liability to third parties." *Northlake*, 60 So. 3d at 797 (emphasis added). Barrett makes this same point when he argues that the relevant time frame for ratification purposes is not six years, measured from the date of the execution of the WHJ Guaranty, but one year and seven months, measured from the date he first learned about the forgery. (Adv. Dkt. 84 at 3). The Court, therefore, examines the summary judgment record to determine whether there is a genuine dispute demonstrating that Barrett ratified the WHJ Guaranty *after* he became aware of the forgery.

Barrett testified that he discussed the forgery with his attorneys shortly after his discovery in late July 2016 but that he did not inform Origin Bank until March 2018 when he filed the Answer to Initial Complaint. His explanation for not notifying Origin Bank sooner was that his attorneys told him "it is too late." (Adv. Dkt. 69-10 at 24). Moreover, Barrett "had assumed that the proceeds [from the sale of the Airplane] were going to be such that there was no deficit at the end of it." (Adv. Dkt. 69-10 at 36). For these reasons, Barrett continued his negotiations with Origin Bank regarding the disposition and sale of the Airplane from July 2016 through August 2017. The terms of the Settlement Agreement required Barrett, Origin Bank, and WHJ to consent to a process for the Airplane Sale. Barrett succeeded in negotiating a process that allowed him to select the broker who would market and sell the Airplane. (Adv. Dkt. 69-1 at 9). Barrett admits that he was aware of the alleged forgery during these extensive negotiations.

The Court finds that the undisputed facts establish that Barrett ratified the WHJ Guaranty by not repudiating it within a reasonable period of time after he learned of the forgery. Barrett not

only failed to notify Origin Bank that he was not actually a guarantor of the WHJ Loan, but he also actively engaged in negotiations with Origin Bank and WHJ while remaining silent.  By doing so, Barrett deprived Origin Bank of the opportunity to protect itself.  The Court further finds that Barrett's ratification of the WHJ Guaranty precludes him from denying its validity.  Accordingly, the Court further finds that in the absence of any dispute as to the remaining elements of Origin Bank's breach-of-guaranty claim, Origin Bank is entitled to summary judgment as to Barrett's liability.

### b.   Equitable Estoppel

As an alternative ground for summary judgment, Origin Bank asserts that Barrett is equitably estopped from denying the validity of the WHJ Guaranty because it detrimentally relied on the WHJ Guaranty in extending the WHJ Loan for the purchase of the Airplane.  (Adv. Dkt. 83 at 8).  Mississippi courts recognize equitable estoppel as an exception to the Statute of Frauds. *Ruffins v. Tower Loan of Miss., Inc.* (*In re Ruffins*), 465 B.R. 115, 121 (Bankr. N.D. Miss. 2011). Equitable estoppel is "the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed." *Hancock Bank v. Bates (In re Bates)*, No. 09-05092-NPO, 2010 WL 2203634, at *10 (Bankr. S.D. Miss. May 27, 2010) (citing *Dubard v. Biloxi H.M.A., Inc.*, 778 So. 2d 113, 114 (Miss. 2000)).  The goal of equitable estoppel is to "forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." *Swartzfager v. Saul*, 213 So. 3d 55 (Miss. 2017).

The elements of equitable estoppel *by silence* in Mississippi are:  (1) that the party had a duty to speak, (2) that his failure to speak was either intentional or in negligent disregard of plain

dictates of conscience and justice, and (3) that the other party relied on the fact of silence to his detriment. *Morrow v. Vinson*, 666 So. 2d 802, 803 (Miss. 1995); *see also Hohenberg Bros. Co. v. Killebrew*, 505 F.2d 643, 646 (5th Cir. 1974). The burden of proof is on the party pleading equitable estoppel. *Chapman v. Chapman*, 473 So. 2d 467, 470 (Miss. 1985). The distinction between being bound through ratification and being bound by estoppel is that a party is bound by ratification because he intended to be bound, but he is bound by equitable estoppel, notwithstanding the absence of any intention to be bound, because the other party will be prejudiced by his conduct. *Gulf Ref. Co.,* 30 So. 2d at 399-400.

In support of its equitable estoppel argument, Origin Bank relies on the Mississippi Supreme Court's decision in *Swartzfager*. (Adv. Dkt. 83 at 9). There, the Mississippi Supreme Court ruled that Jon A. Swartzfager ("Swartzfager") was equitably estopped from denying the validity of an oral agreement to sell land to Thomas R. Saul ("Saul"). *Swartzfager*, 213 So. 3d at 65. The *Swartzfager* Court found that Saul had detrimentally relied on Swartzfager's promises to sell Saul a parcel of land, most notably by selling his house and moving his family to a mobile home. Origin Bank argues that Barrett, like Swartzfager, "should not reap the benefits of a contract while simultaneously trying to avoid its burdens." *Id.* (quotation & citation omitted). The benefit to Barrett, according to Origin Bank, was WHJ's purchase of the Airplane and Barrett's frequent use of the Airplane for nearly six years. (Adv. Dkt. 83 at 10).

Origin Bank argues that it not only relied upon the WHJ Guaranty to fund the WHJ Loan but also continued to rely on the validity and enforceability of the WHJ Guaranty following the commencement of the WHJ Case. Yet Barrett failed to inform Origin Bank of the alleged forgery of his name. According to Origin Bank, Barrett's silence lulled it into a false sense of security that led to its decision to agree to the terms of the Settlement Agreement. Origin Bank contends that

if Barrett had reported the forgery sooner, it would have acted sooner to foreclose on the Airplane. Origin Bank argues that for that reason, Barrett should be equitably estopped from asserting the alleged forgery.

Origin Bank's detrimental reliance on the WHJ Guaranty at the time it extended the WHJ Loan is undisputed by Barrett. The Court finds, however, that Barrett's duty to inform Origin Bank of the alleged forgery did not arise until he discovered it. For purposes of the Origin Summary Judgment Motion, Barrett's testimony that he did not know about the forgery until late July 2016, well after Origin Bank had funded the WHJ Loan, must be accepted as true. The Court thus focuses its inquiry on whether there is a genuine dispute that Origin Bank suffered prejudice as a result of Barrett's silence after July 2016. At that point, the DOJ already had seized the Airplane, and the parties already had entered into the Settlement Agreement.

During the period that Barrett was aware of the forgery, he did not attempt to have the Settlement Agreement set aside and vacated. Rather, he continued engaging in negotiations with Origin Bank regarding the retention of a broker to market and sell the Airplane. (Adv. Dkt. 69-1 at 9). Origin Bank agreed to allow Barrett to select the broker. (Adv. Dkt. 69, ¶ 27). After the broker selected by Barrett failed to sell the Airplane within the agreed time frame, Origin Bank pursued the abandonment of the Airplane from the bankruptcy estate and conducted a public auction sale on September 1, 2017. Viewed objectively, Barrett's conduct misled Origin Bank into believing that the WHJ Guaranty was valid after July 2016. The Court, therefore, finds that Origin Bank reasonably relied on Barrett's silence to its detriment. Accordingly, the doctrine of equitable estoppel applies to prevent Barrett from denying the validity of the WHJ Guaranty, and, in the absence of any dispute as to the remaining elements of Origin Bank's breach-of-guaranty claim, Origin Bank is entitled to summary judgment as to Barrett's liability.

### c.    Judicial Estoppel

Origin Bank argues as an additional alternative ground for summary judgment that Barrett is judicially estopped from taking a new position in this litigation that he did not sign the WHJ Guaranty.  Federal law governs the application of judicial estoppel in federal courts.  *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 205 (5th Cir. 1999).  Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding in order "to prevent litigants from playing fast and loose with the courts."  *Hall v. GE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (internal quotations & citations omitted).  There are three requirements for application of the judicial estoppel doctrine:  (1) the party has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.  *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (en banc); *Superior Crewboats, Inc. v. Primary P&I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 334-35 (5th Cir. 2004).  The application of judicial estoppel is within a court's discretion.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

Judicial estoppel differs from equitable estoppel.  Whereas judicial estoppel is "intended to protect the judicial system[] *rather than the litigants*," equitable estoppel focuses on the relationship between the parties and applies where one of the parties has relied detrimentally upon the position taken by the other party.  *In re Coastal Plains, Inc.*, 179 F.3d at 205; *Texaco Inc. v. Duhe*, 274 F.3d 911, 923 n.16 (5th Cir. 2001).

Origin Bank contends that Barrett is judicially estopped from asserting the position that he did not sign the WHJ Guaranty because he previously asserted the contrary position in the WHJ Case, which this Court accepted as true when it entered the Settlement Order.  Origin Bank also

contends that there are numerous agreements, joint motions, and agreed orders where WHJ consistently described Barrett in the WHJ Case as the guarantor on the WHJ Loan, as follows: (1) Schedule H: Your Co-Debtors (Bankr. Dkt. 102); (2) Notice of Amended Creditor Matrix (Bankr. Dkt. 104); (3) Amended Schedule H: Your Co-Debtors (Bankr. Dkt. 110); (4) Amended Schedule D: Creditors Who Have Claims Secured by Property (Bankr. Dkt. 109-1 at 8); and (5) the Response of the Debtors to Origin Bank's Motion to Lift Automatic Stay and Abandon Collateral and for Other Relief (Case No. 16-00297-NPO, Dkt. 225).

With regard to the first element of judicial estoppel, the Court finds that Barrett's previous statements in the Joint Motion for Approval of Settlement that he signed the WHJ Guaranty is plainly inconsistent with his subsequent position in this litigation that he did not. *Cox v. Richards*, 761 F. App'x 244, 247 (5th Cir. 2019) (recognizing that an adversary proceeding and the related bankruptcy case constitute two distinct proceedings). Additionally, the Court finds that such statements also appear in numerous documents filed by WHJ that likewise are plainly inconsistent with Barrett's new allegation of forgery. Although these documents were filed by WHJ, not Barrett, the Court finds that there is sufficient identity of interest between Barrett and WHJ to attribute the statements to Barrett for purposes of judicial estoppel. *See, e.g., Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989) (holding that a party can use issue preclusion against a plaintiff who was not a party to the first suit so long as the plaintiff was in privity with that party). Barrett was the sole member and owner of WHJ, and, therefore, there was privity between them. *See Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975) (privity exists where the party's interests are so closely aligned as to be his virtual representative).

As to the second element for the application of judicial estoppel, the Court finds that it accepted Barrett's statement in the Joint Motion for Approval of Settlement when it entered the

Settlement Order.  The Court disagrees with Barrett's contention that the statements were merely "a recitation of a background fact" and were not "the least bit important to the Court's consideration of the matters or its rulings."  (Adv. Dkt. 81 at 16).  Barrett's status as a guarantor of the WHJ Loan was the reason for his participation in the Settlement Agreement.  He agreed to pay for certain costs associated with the sale of the Airplane and, in return, gained some control over the sales process because of his role as a guarantor.

The third element of judicial estoppel requires that the failure to disclose was not inadvertent, meaning that Barrett did not know of his inconsistent position or had no motive to conceal it from the Court.  *Jethroe v. Omnova Sols., Inc.*, 412 F. 3d 598, 600 (5th Cir. 2005).  Here, Barrett alleges that judicial estoppel does not apply because he lacked knowledge of the forgery until late July 2016.  Whether Barrett can establish inadvertence based on his alleged lack of knowledge of the forgery—even though he was aware of the WHJ Loan, signed the Final Notice of Agreement that indicated his personal guaranty of the WHJ Loan, and possessed a copy of the WHJ Guaranty but did not look at his signature until late July 2016—raises a question of fact.  It is undisputed, however, that the process to sale the Airplane contemplated by the parties pursuant to the Settlement Agreement remained unchanged after July 2016.

For example, in the Order Approving Broker entered on August 18, 2016, the Court noted that Barrett had agreed to the sales process, to enter into the agreement with an airplane sales broker, and to pay the brokerage fees.  Moreover, in the Order Approving Broker, the Court specifically granted Barrett access to the broker to discuss the sales process.  The Sales-Procedures Order entered on August 19, 2016, likewise referred to Barrett, noting his agreement to pay attorney's fees and all fees required by 28 U.S.C. § 1930(a)(6) associated with the disbursement of the proceeds from the Airplane Sale.  The Court entered the Order Approving Broker and the

Sales-Procedures Order after July 2016 based, in large part, on the earlier statements by Barrett in the Settlement Agreement and the representations by WHJ in numerous other documents filed in the WHJ Case that Barrett signed the WHJ Guaranty and, therefore, had an interest in the Airplane. Why else would Barrett have standing to dictate the sale process? Why else would he agree to take on these obligations individually if not to benefit his position as guarantor? Accordingly, because all three elements of judicial estoppel are met, the Court finds that Barrett is judicially estopped from denying the validity of the WHJ Guaranty. The Court further finds that in the absence of any dispute as to the remaining elements of Origin Bank's breach-of-guaranty claim, Origin Bank is entitled to summary judgment as to Barrett's liability.

## Conclusion

For the above reasons, the Court finds that the Motion to Strike should be denied. The Court further finds that the Barrett Summary Judgment Motion should be denied, and the Origin Summary Judgment Motion should be granted. Barrett is personally liable for breach of the WHJ Guaranty as alleged in Count I of the Amended Complaint. These findings are consistent with Judge Reeves' observations in the Briefing Order that there is a factual dispute in the record as to whether Barrett personally guaranteed the WHJ Loan and, moreover, that "[*i*]f there is a trial . . . , it will be held only to determine the appropriate amount of damages and attorney's fees." (Adv. Dkt. 89 at 10. The Court finds no error or omission in these observations.

No final judgment will be entered at this time for two reasons. First, this Opinion does not resolve the issue of damages as to Count I. Barrett challenges, for example, the amounts claimed by Origin Bank for the costs or maintenance and storage of the Airplane during the time it was marketed for sale. (Adv. Dkt. 69-10 at 32, 34, 36-37). Second, Count II and Count III of the

Amended Complaint remain unresolved either as to liability or damages.  By separate notice, the Court will set a trial on these remaining issues.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Motion to Strike is denied.

IT IS FURTHER ORDERED AND ADJUDGED that the Barrett Summary Judgment Motion is denied.

IT IS FURTHER ORDERED AND ADJUDGED that the Origin Summary Judgment Motion is granted.  Barrett is personally liable for breach of the WHJ Guaranty as alleged in Count I of the Amended Complaint.

IT IS FURTHER ORDERED AND ADJUDGED that a separate hearing and/or trial will be set on the issue of damages as to Count I of the Amended Complaint and on the issues of both liability and damages on Count II and Count III of the Amended Complaint.

##END OF OPINION##